IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MELANIE BAUER, individually and as EXECUTRIX of the Estate of Florence T. Logan; MAUREEN HOMME, MICHELE OGREN, DANA METZ, AND DREW ROACH, SR., <br><br> Plaintiffs, <br><br> v. <br><br> DALE A. ROACH, JR., individually and as TRUSTEE OF THE FLORENCE T. LOGAN REVOCABLE LIVING TRUST, and EVA ROACH, <br><br> Defendants. | Civil No. 18-10613 (RBK/AMD) <br><br> **OPINION** |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendants' Motion for Sanctions (Doc. 35). For the reasons detailed herein, Defendants' motion is DENIED.

## I.  BACKGROUND

This case, which stems from a contentious family relationship, centers on the life and death of Florence T. Logan, known more colloquially as the parties' "Aunt Florence." Plaintiffs are comprised of Aunt Florence's sister, Victoria Roach, and five of Aunt Florence's nieces and nephews: Melanie Bauer, Maureen Homme, Michele Ogren, Dana Metz, and Drew Roach, Sr. (Doc. 22 ("SAC") ¶10.) Plaintiffs live in New Jersey and South Carolina. (*Id.* ¶¶17–22.) Defendants include Aunt Florence's nephew, Dale Roach, Jr., and his wife, Eva Roach, as well as the "Florence T. Logan Revocable Living Trust," of which Dale is Trustee. Dale and Eva live in Florida. (*Id.* ¶¶23–24.)

*Factual History*

In 2001, Aunt Florence was living alone in her duplex in Wildwood Crest, New Jersey. (SAC ¶30.) At Dale and Eva's suggestion, since 2003 onward, Aunt Florence began to spend most of every year at their house in Florida (the "Florida house") and lived in New Jersey only in the warmer months. (*Id.* ¶31.) Plaintiffs allege that, as Dale and Eva knew that Aunt Florence was wealthy, they took advantage of her in numerous ways during her time in Florida.

For example, Defendants allegedly convinced Aunt Florence to purchase their Florida house and pay off the mortgage, but asked her to allow them to continue living in the house for a low rent. (*Id.* ¶¶39–42.) Plaintiffs allege that, after Aunt Florence bought the house, Defendants both refused to pay rent and refused to leave the house. (*Id.* ¶¶41–42.) Defendants allegedly siphoned off Aunt Florence's assets in other ways as well, convincing her to pay for additions to the Florida house, invest in Dale's dry-cleaning business, and lend money to the couple which they never paid back. (*Id.* ¶¶44–51.)

Plaintiffs claim that the tension growing between Aunt Florence and Defendants reached its peak when Defendants attempted to make Aunt Florence sign over her rights to the Florida house. (SAC ¶55.) Angry with Defendants, Aunt Florence returned to New Jersey. (*Id.* ¶58.) Plaintiffs allege that, upon her return, Aunt Florence asked them to help her safeguard her various assets from Dale and Eva. (*Id.* ¶¶59–66.) Aunt Florence modified her bank accounts and savings plans, and met with an attorney in New Jersey to amend her will. (*Id.* ¶¶67–68.) Aunt Florence then learned that Defendants had put the Florida house up for sale, despite the fact that they did not own it. (*Id.* ¶¶69–79.) Aunt Florence had been planning to return to Florida to address the situation, but her plans were abruptly canceled when she fractured her hip in September 2017. (*Id.* ¶¶79–80.)

While in the hospital for her injury, Plaintiffs allege that Aunt Florence finalized a new will. (SAC ¶¶81–82.) Unfortunately, after having hip replacement surgery, Aunt Florence began to worsen. (*Id.* ¶83.) Plaintiffs claim that she began to experience symptoms associated with Parkinson's disease psychosis, such as anxiety, memory loss, forgetfulness, and hallucinations. (*Id.* ¶83.) Due to her physical and mental condition, Aunt Florence remained in a rehabilitation center. While at the center, Aunt Florence was allegedly coordinating with her family, Maureen and Michele, to set up a live-in healthcare aide in her Wildwood Crest home, so that she could safely live there upon her discharge.

Aunt Florence's plans again went awry. She was discharged from the rehabilitation center on October 23, 2017, and a home care agency transported her to her Wildwood Crest home. (SAC ¶98.) There, she was greeted by unexpected visitors: Dale's paternal aunt and uncle, Lori and David Roach. (*Id.* ¶99.) The Roaches asked the home health aides to leave; the aides called Michele and informed her that they had been told their services were no longer needed. (*Id.* ¶¶100–101.) The next day, Dale flew to New Jersey and convinced Aunt Florence to come back to Florida with him. (*Id.* ¶103.) The New Jersey family attempted fruitlessly to contact Aunt Florence, save for one instance where Dale and Aunt Florence asked for her wallet to be mailed to Florida. (*Id.* ¶108.)

Plaintiffs allege that they were unable to reach Dale again until a phone call on December 3, 2017. (*Id.* ¶116.) During this call, Dale informed Maureen that, at Aunt Florence's request, he had helped her to make changes to her financial accounts and her will that reversed many of the changes she had made in New Jersey. (*Id.* ¶119–122.) He then added that Aunt Florence's health had rapidly declined after arriving in Florida: he had taken her off her medications because he felt she was addicted to them, and he ultimately had to admit Aunt Florence to a hospital, where she then suffered a stroke. (*Id.* ¶¶124–129.) Still unconscious, Aunt Florence was moved to a nursing

home. (*Id.*) Aunt Florence's sister, Victoria, then reached out to Dale to express her concerns. (*Id.* ¶143–144.) Dale allegedly became angry, threatened Plaintiffs, and instructed Aunt Florence's nursing home to not allow any phone calls or visitors. (*Id.* ¶¶144–145.)

Unable to reach Aunt Florence, Plaintiffs continued sending messages, cards, and Christmas gifts. (SAC ¶50.) Plaintiffs also contacted the Florida Department of Elder Affairs, but claim that they were not provided any useful assistance. (*Id.* ¶155.) On February 27, 2018, Victoria was reading an online newspaper when she saw an obituary for Aunt Florence. (*Id.* ¶156–158.) Plaintiffs then learned that Aunt Florence had passed away on February 6, 2018, and had already been cremated at Dale's direction. (*Id.* ¶¶156–159.)

Plaintiffs later discovered that, before she passed, Aunt Florence's financial accounts had been altered to name Dale as beneficiary, and control of Aunt Florence's trust had been handed to Dale. (*Id.* ¶¶161–169.) Plaintiffs also learned that, four days before Aunt Florence's death, one of Aunt Florence's properties was purchased by the Trust and Dale as tenants in common. (*Id.* ¶171.) After her death, Dale directed the Trust to transfer the entire interest to him only; he then transferred his interest in the property to himself and Eva for $1.00. (*Id.* ¶172.) He also directed the Trust to sell Aunt Florence's Wildwood Crest home. (*Id.* ¶174.) Plaintiffs claim that they were informed that Aunt Florence had no assets passing through a will, and that no will would be probated. (*Id.* ¶163.)

*Procedural History*

On June 14, 2018, Plaintiffs filed their Complaint in this Court. Plaintiffs then amended their Complaint twice, with the most recent version (the "Second Amended Complaint" or "SAC") dated October 2, 2019. (Doc. 22.) The SAC contained the following fourteen counts: (1) Disinheriting the Abusers under the New Jersey Slayer Act; (2) Disgorgement of Assets

Improperly Obtained by the Abusers; (3) Wrongful Death; (4) Elder Abuse and Exploitation; (5) False Imprisonment and Kidnapping; (6) Undue Influence; (7) Diminished Capacity and Lack of Testamentary Intent; (8) Breaches of Fiduciary Duties; (9) Conversion; (10) Fraud, Deceit, and Misrepresentation; (11) Negligence; (12) Negligent and/or Intentional Infliction of Emotional Distress; (13) Wasting of Aunt Florence's Property and/or the Inheritances of the Beneficiaries; and (14) Conspiracy.

On October 16, 2019, Defendants filed a motion to dismiss the SAC. (Doc. 23.) On December 27, 2019, Defendants filed a motion for sanctions. (Doc. 35.) On April 6, 2020, Plaintiffs voluntarily dismissed the SAC, and the case was terminated. (Doc. 38.) Defendants assert that, despite Plaintiff's dismissal, they wish to continue with their motion for sanctions. (Doc. 39.) The Court addresses this motion now.

## II.   LEGAL STANDARD

Sanctions under Rule 11 of the Federal Rules of Civil Procedure "are warranted only in the exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Goldenberg v. Indel, Inc.*, Civ. No. 09-5203, 2011 WL 1134454, at *2 (D.N.J. Mar. 25, 2011) (citing *Watson v. City of Salem*, 934 F. Supp. 643, 662 (D.N.J. 1995)); *see also Doering v. Union Cnty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988). Indeed, the Third Circuit has recognized that Rule 11 sanctions should be imposed "only in those rare instances where the evident frivolousness of a claim or motion amounts to an 'abuse [ ] of the legal system.'" *Goldenberg*, 2011 WL 1134454, at *2 (quoting *Doering*, 857 F.2d at 194).

A Rule 11 motion alleging that a party has violated subsection (b) of the rule must be filed as a separate pleading. *See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates

Rule 11(b)."). Further, before addressing the merits of a party's Rule 11 motion, the Court must determine whether the party complied with the "safe harbor" provision of Rule 11(c)(2). Under that provision, a party cannot file a motion for sanctions until it first presents the motion to the offending party, and allows 21 days for the other party to withdraw or correct the challenged issue. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008) (citing Fed. R. Civ. P. 11(c)(2)).

### III.  DISCUSSION

Defendants' Rule 11 motion here was properly filed as a separate pleading, and properly complied with the safe harbor provision. The Court therefore turns to the substance of Defendants' motion. Defendants argue that sanctions are warranted because Plaintiffs knew or should have known that the entire SAC was preempted by the probate exception to federal jurisdiction, and thus Plaintiffs had no good faith basis for pursuing litigation in federal court. (Doc. 35-2 at 16.)

"The probate exception is a jurisdictional limitation on the federal courts originating from the original grant of jurisdiction in the Judiciary Act of 1789." *Three Keys Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 226 (3d Cir. 2008). "Under this exception, federal courts lack jurisdiction over 'the probate or annulment of a will [or] the administration of a decedent's estate.'" *Anglin v. Anglin*, Civ. No. 16-4049, 2018 WL 1278304, at *2 (D.N.J. Mar. 12, 2018) (quoting *Marshall v. Marshall*, 547 U.S. 293, 311 (2006)). Courts within the Third Circuit apply the probate exception only where a "federal court is endeavoring to (1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court." *Three Keys Ltd.*, 540 F.3d at 227. "The Supreme Court has emphasized that the probate exception is a 'narrow exception' of 'distinctly limited scope.'" *Anglin*, 2018 WL 1278304, at *2 (quoting *Marshall*, 547 U.S. at 305, 310).

6

Examining the SAC, it is immediately clear that several claims would not be barred by the probate exception. These claims, which include Elder Abuse and Exploitation (Count IV), False Imprisonment and Kidnapping (Count V); and Negligent and/or Intentional Infliction of Emotional Distress (Count XII), do not require this Court to probate a will, administer an estate, or assume *in rem* jurisdiction over property in probate court custody. Indeed, despite Defendants' hyperbolic claim that the *entire* SAC is barred by the probate exception, their motion makes no argument whatsoever as to how the probate exception applies to these specific claims.

Whether the remaining claims fall under the probate exception is more questionable. The parties extensively addressed the issue in their briefing on Defendants' now-moot motion to dismiss. (Doc. 23.) In their response in opposition (Doc. 33) to Defendants' motion to dismiss, Plaintiffs argued that the SAC is not barred by the probate exception, as it seeks *in personam*, rather than *in rem*, judgments, and it seeks adjudication of assets not within the jurisdiction of the state probate court. (Doc. 33 at 33.)

In asserting such, Plaintiffs make well-reasoned arguments with proper support from relevant case law. For example, Plaintiffs argue that the SAC seeks to invalidate *inter vivos* transfers Aunt Florence made to Dale before her death, and cite to caselaw holding that this type of claim is not barred by the probate exception. (Doc. 33 at 36.) Plaintiffs are correct that, "notwithstanding the probate exception, a district court retains its jurisdiction to hear a claim where a plaintiff seeks an *in personam* judgment against a defendant because the defendant used tortious means to prevent the making of the *inter vivos* or testamentary gifts that the decedent had intended to provide to the beneficiary/plaintiff." *Luellen v. Luellen*, 972 F. Supp. 2d 722, 730 (W.D. Pa. 2013) (citing *Marshall v. Marshall*, 547 U.S. 293, 300 (2006)). Plaintiffs' articulate use of

7

supporting caselaw contravenes Defendants' argument that Plaintiffs "have clearly not done their due diligence" and failed to conduct even a "simple search" of existing caselaw. (Doc. 35-2 at 16.)

Finally, in their opposition to Defendants' motion to dismiss, Plaintiffs do admit that there are three instances in the SAC which likely run afoul of the probate exception, as those sections request relief that would require this Court to invalidate Aunt Florence's Florida Will. (Doc. 33 at 34.) Recognizing this, Plaintiffs appeared willing to have these portions of the SAC stricken, and argued that the remainder of the SAC would then be unaffected by the probate exception and would survive Defendants' motion to dismiss. (Doc. 33 at 34.)

Whether Plaintiffs' arguments would have prevailed at the motion to dismiss stage remains undetermined, as they voluntarily dismissed the case before the Court entered its ruling, and the Court will not now adjudge a motion that has been terminated. However, in the context of this motion for sanctions, the Court finds it significant that Plaintiffs' arguments in defense of the SAC were grounded in relevant legal precedent, and were not, as would be required for imposition of sanctions, patently frivolous. *Goldenberg*, 2011 WL 1134454, at *2. The issue Plaintiffs primarily sought to litigate—invalidation of *inter vivos* transfers from Aunt Florence to Dale—is one that courts within the Third Circuit routinely address. *See, e.g., Luellen*, 972 F. Supp. 2d 722; *Rothberg v. Marger*, Civ. No. 11-5497, 2013 WL 1314699 (D.N.J. Mar. 28, 2013). Whether Plaintiffs would have actually been successful in their specific argument does not determine whether sanctions should be imposed, as "mere failure to prevail does not trigger a sanction award." *Young v. Smith*, 269 F. Supp. 3d 251, 333 (M.D. Pa. 2017), *aff'd*, 905 F.3d 229 (3d Cir. 2018).

Where the probate exception did bar portions of the SAC, Plaintiffs admitted as much in the briefing on the motion to dismiss and accepted that these portions might be stricken, rather than baselessly arguing that the probate exception did not apply at all. Finally, albeit nearly six

months after Defendants filed their motion to dismiss, the Court notes that Plaintiffs did voluntarily dismiss this case.

Considering the above, the Court finds that sanctions are not appropriate. While intra-family litigation such as this no doubt adds an additional layer of hostility to an already adversarial proceeding, sanctions are reserved only for those "exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Goldenberg*, 2011 WL 1134454, at *2. Such circumstances are not present here.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Sanctions (Doc. 35) is DENIED. An accompanying Order shall issue.

Dated:  8/18/2020                                          /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge